# United States Court of Appeals
## For the First Circuit

No. 08-1063

UNITED STATES OF AMERICA,

Appellee,

v.

GREGORY WRIGHT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Charles W. Rankin, with whom Michelle Menken and Rankin & Sultan, were on brief for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, former United States Attorney, was on brief for appellee.

September 23, 2009

**TORRUELLA**, **Circuit Judge**.  This is the second appeal concerning a <u>Terry</u> stop which resulted in the entry of a conditional guilty plea by appellant Gregory Wright for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1).  In the <u>Terry</u> stop at issue, Boston police officers recovered a gun from Wright's sweatshirt pocket after Wright was observed leaning forward from the backseat of a car to identify the officers, quickly exiting and running from the car, clutching at the right side of his sweatshirt while running, and ignoring the officers' order to stop.  Below, Wright moved to suppress the gun, but the district court denied the motion, concluding that the officers had reasonable suspicion to stop him.  In Wright's first appeal, we ruled that the district court's denial of the suppression motion was tainted with legal error, and remanded for further proceedings. <u>United States</u> v. <u>Wright</u>, 485 F.3d 45, 54 (1st Cir. 2007).  On remand, the district court again denied the motion, and Wright renewed his appeal.  This time, after a careful review of the record, we affirm.

## I.  Background

### A.  The Prior Proceedings

The district court first denied Wright's motion to suppress after an evidentiary hearing at which three officers testified about the circumstances leading to his arrest.  On appeal, we held that the district court's conclusion that the

-2-

officers had reasonable suspicion to stop Wright was based on a legal error. The court interpreted Wright's running as "flight," and accepted the police officers' testimony that they saw Wright clutch his sweatshirt, by linking those findings to the subsequent discovery of the gun. Id. at 48.

We further held that the court's self-described "backwards" reasoning fatally tainted its factual findings. See id. at 48, 52 (quoting the district court as stating "Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he was carrying a weapon and I do so reason"). We observed that it was "impossible to discern whether the court would have concluded that Wright knowingly fled from the police if it had not considered the eventual recovery of the gun." Id. at 52. Similarly, we could not evaluate the court's finding on Wright's hand movement because the court had used its "commonsense assumption that the gun was heavy . . . [to] ma[k]e a factual finding that Wright grabbed his sweatshirt because he was carrying a heavy gun." Id. at 53. We concluded that the flaw in the underlying factual findings invalidated the court's legal conclusion that the officers had reasonable suspicion to stop Wright, requiring us to vacate the denial of the suppression motion. Id.

In remanding the case for reconsideration, we also

addressed the district court's discussion of the area where Wright was stopped. The court had stated that it did not conclude that the area was a "high crime area," a characterization that would have been relevant to the inquiry into whether "the circumstances [were] sufficiently suspicious to warrant further investigation," Illinois v. Wardlow, 528 U.S. 119, 124 (2000); see also id. ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a [reasonable suspicion] analysis."). Because the district court expressed uncertainty about whether the high crime area finding was a legal question or a mixed question of fact and law, we clarified that the character of a stop's location is a factual issue. Wright, 485 F.3d at 53. We observed that the court might choose to revisit the question upon remand. To assist its possible reevaluation of the issue, we identified a number of relevant factors to be considered. See id. at 53-54.

**B. The Remand Proceedings**

On remand, the district court solicited supplemental briefing and heard oral argument from the parties, but took no additional evidence. In its ruling from the bench, the court expressly adopted the description of the stop set out in our prior decision, with some modifications:

> On the evening of November 8, 2004, a caravan of four unmarked police cars was patrolling in Dorchester, Massachusetts. The cars were Crown Victorias, a model widely associated

with police departments. The plainclothes officers in the caravan were members of the Boston Police Department Youth Violence Task Force.

At about 7:45 p.m., the caravan was driving north on Blue Hill Avenue and slowed down as the lead car passed a vehicle that had just pulled over in front of a mini-mart at 1216 Blue Hill Avenue. The parked car was partially blocking one of two driveway entrances to the mini-mart parking lot. Officer Brown, who was seated in the lead car's front passenger seat, looked to his right as they passed the parked vehicle and observed three people, one of whom he recognized as Omar Edwards, a neighborhood resident. He did not recognize the driver or the passenger seated in the back seat of the parked car.

Immediately after passing this parked vehicle, Officer Brown's car pulled over to the right parking lane, in front of the parked car. The rest of the caravan came to a stop in the right travel lane to the rear of the parked car. The front passenger of the second police car, Officer Bordley, then observed the back seat passenger of the parked car, later identified as appellant, lean forward as though he was looking at the Crown Victoria that had just pulled over in front of his car. Wright then exited his car, on the passenger side, and began to run southward down Blue Hill Avenue. As he ran, Wright "grabbed toward the front of his sweatshirt in the vicinity of his waist."[1]

Officer Brown quickly exited his car, as did a number of the other officers in the caravan. The police ordered Wright to stop running, but he did not obey this directive. Within a

_____

[1] The court added the phrase in quotation marks to the recitation of the facts in our prior decision, which stated that Wright "put one hand on the right side of his sweatshirt, grabbing or holding onto the sweatshirt pocket." Id. at 47.

-5-

> matter of seconds, the officers caught up to Wright, who resisted the officers' attempts to frisk him.[2] The police patted Wright down and recovered a silver pistol from his sweatshirt pocket. He was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

See id.

Based on these facts, Wright argued that the officers lacked reasonable suspicion to stop him. He noted that the officers' testimony suggested no suspicious motive either for Wright's leaning forward in the car or for grabbing at his sweatshirt. Instead, Wright argued that the officers' testimony indicated that they had stopped Wright only because he had run from the car. Wright asserted that running in those circumstances, without more, was insufficient to justify the stop.

The government countered that the totality of the circumstances demonstrated that the officers had reasonable suspicion to stop Wright. The government argued that Wright's running from the car, which it considered "flight," along with his "clutching at either the waist or the side of the sweatshirt" were sufficient to justify the stop. The government further contended that a finding that the area in which the stop occurred was a "high crime area" under Wardlow was not necessary. However, the

---

[2] The district court concluded its reading of our factual summary at this point, noting that it did not need to make further findings because the officers "had already seized him prior to this finding about resisting. So, there must be an adequate constitutional basis to chase after him and seize him under the Fourth Amendment."

-6-

government argued that the district court could take into account "the officers' testimony regarding what . . . their particular knowledge of that area was at that time."

After hearing argument from both sides, and after setting forth its findings of fact, the district court ruled as follows:

> So, there must be an adequate constitutional basis to chase after [Wright] and seize him under the Fourth Amendment, and it is to that issue the Court now turns.
>
> These are mixed issues of law and fact. I conclude that the officers had no right to seize Mr. Wright at the point when their, the vehicles, both the one in front, the police cars in front, and the two police cars behind, came to park in front and back. They had no right to seize him under the Fourth Amendment simply because Officer Bordley saw him lean forward. I do think that it is a reasonable inference from Officer Bordley's testimony that Officer Bordley thought, though he did not expressly so testify, that Mr. Wright had made [i.e., recognized] the unmarked police car that had parked in front.
>
> I infer from the testimony that, though things happened in split second intervals, Mr. Wright had started to run, I do not at this point say flee, he had started to run before the officers had started to run after him. The Court infers, and again the testimony is what it is, it's not explicit, I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed his side, clutched at something in his sweatshirt. The Court infers that the officers did in that split second draw the inference that he might well possess a weapon.
>
> Having drawn that inference, that is sufficient under all the circumstances to order Mr. Wright to stop, and when he did not

stop, t[o] chase after him and seize him, the actual seizure is when the officers came in contact with Mr. Wright.

The court also revisited whether the <u>Terry</u> stop occurred in a high crime area:

> It's necessary I think to go a little further in honor, out of respect to the reasoning of the Court of Appeals, because I think this is a very close case. I do not find that this was a high crime area as the language is used in <u>Wardlow</u>. The first time round I expressed some unease with that definition. And my unease continues. I don't make that finding. I honor what I infer is the police officers' experience and knowledge of the communities which they patrol. . . . [T]he problem I have with that <u>Wardlow</u> type of analysis, candidly, is that the rights of the citizens in the Dorchester area of Boston have to be identical to the rights of citizens in Milton and Wellesley. They have to be scrupulously identical.

> So, while I treat all the circumstances taken as a whole and I draw inculpatory inferences . . . from what I infer was the observations of the officers and their response, their immediate order to Mr. Wright to stop, I rule that that would have been enough if the officers had acted in the same fashion in Wellesley or Milton, not because of this particular area along Blue Hill Avenue is a high crime area. I think I've said all that needs to be said.

Wright renewed his appeal.

## II. <u>Discussion</u>

On appeal, Wright again contends that the district court erred in concluding, based on the totality of the circumstances, that the officers in this case had reasonable suspicion to stop

-8-

him.

## A.  The Legal Framework

Under <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968), and its progeny, a police officer may briefly detain an individual for questioning if the officer has "reasonable suspicion to believe that criminal activity 'may be afoot.'"  <u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 273 (2002) (quoting <u>United States</u> v. <u>Sokolow</u>, 490 U.S. 1, 7 (1989)); <u>see also</u> <u>Terry</u>, 392 U.S. at 30 (permitting such a stop when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot").  "While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause."  <u>United States</u> v. <u>Ruidíaz</u>, 529 F.3d 25, 29 (1st Cir. 2008).

Reasonable suspicion requires "'a particularized and objective basis' for suspecting the person stopped of criminal activity."  <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 696 (1996) (quoting <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417-18 (1981)).  "Th[e] particularity requirement means, in effect, that such a finding must be 'grounded in specific and articulable facts.'"  <u>United States</u> v. <u>Espinoza</u>, 490 F.3d 41, 47 (1st Cir. 2007) (quoting <u>United States</u> v. <u>Hensley</u>, 469 U.S. 221, 229 (1985)).  The "objective" component requires courts to "focus not on what the

-9-

officer himself believed but, rather, on what a reasonable officer in his position would have thought."  Id.

We review the district court's findings of historical fact, as well as inferences draw from those facts, for clear error, which exists when we are left with a "'definite and firm conviction that a mistake has been committed.'"  See id. 46 & n.2 (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  We review the district court's ultimate reasonable suspicion determination de novo, Ornelas, 517 U.S. at 699, although the factual component of this "mixed question of law and fact" remains subject to clear error review.  Id. at 696.  In reviewing this determination, we are instructed by the Supreme Court to view the "totality of the circumstances," and not engage in a "divide-and-conquer analysis" whereby we determine whether each of the facts supporting reasonable suspicion are "susceptible to an innocent explanation."  Arvizu, 534 U.S. at 274.  Thus, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."  Id. at 277.

Finally, when a district court has denied a motion to suppress, "'we will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it.'"  United States v. Coccia, 446 F.3d 233, 237 (1st Cir. 2006) (quoting United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003)).

**B.  Application of the Framework**

**1.  <u>The Historical Facts</u>**

The district court adopted the recitation of the facts contained in our prior opinion, and thus found the following sequence of events that resulted in the instant <u>Terry</u> stop, immediately after the car in which Wright was sitting "had just pulled over in front of a mini-mart at 1216 Blue Hill Avenue. . . . partially blocking one of two driveway entrances to the mini-mart parking lot:"

(a)     Wright "lean[ed] forward" from the backseat of his car and then "exited his car on the passenger side";

(b)     Wright then "began to run southward down Blue Hill Avenue";

(c)     "As he ran, Wright put one hand on the right side of his sweatshirt grabbing or holding onto the sweatshirt pocket"; and

(d)     "The police ordered Wright to stop running but he did not obey this directive."

The parties largely do not dispute these facts on appeal.[3]  As to the last finding above, Wright does not dispute that the stop did not occur until Wright was physically restrained <u>after</u> the

---

[3]  Wright challenges the district court's finding, after reciting the statement of facts from the prior opinion, that "Now, going beyond what I'm reciting from the Appeals Court decision, I do find that he grabbed toward the <u>front</u> of his sweatshirt in the vicinity of his waist."  (emphasis added).  Because the location of the clutching is not material, we will give Wright the benefit of the doubt and rely upon the fact recited in our earlier opinion that Wright clutched the side of his sweatshirt.

officers' order to stop.  See California v. Hodari D., 499 U.S. 621, 626 (1991) (holding that a directive to stop is not itself a seizure).  Accordingly, we consider Wright's refusal to stop as a historical fact in determining whether the officers had reasonable suspicion to stop Wright.

Of significance to this appeal, the district court did not find that the area where the events took place was a high-crime area as defined under Wardlow.  Although the officers testified at length that the area was a high-crime area,[4] the government does not press this position on appeal, nor does it claim that the district court committed clear error with respect to this finding.

On appeal, Wright challenges two inferences made by the district court based upon these historical facts.  First, the district court inferred that Officer Bordley, who observed Wright leaning forward, "thought, though he did not expressly so testify,

---

[4] Officer Brown testified that "[t]hat area of Blue Hill Avenue, as well as that corridor, is a very high crime area consisting of firearm violence, drug activity, street robberies, breaking and enterings, all type of street crimes actually."  Officer Celester testified that the area is "a trouble spot.  There's been shootings there, there's been a lot of crime there.  It's a high crime area."  Officer Bordley testified that "[t]he level of criminal activity would be considered high for that area.  Numerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature."  To counter this testimony, Wright offered into evidence incident reports for August 2004 (the most recent prior to the stop) that showed that the area where the stop occurred was not designated a "hot spot" by the Boston Police Department.  We discussed this testimony and the incident reports in some detail in our prior opinion.  See Wright, 485 F.3d at 49.

that Mr. Wright had made [i.e., recognized] the unmarked police car that had parked in front." Second, the district court inferred that the officers inferred from Wright's clutching of the side of his sweatshirt that the officers "ascribed some significance" to that clutching and that "in that split second dr[e]w the inference that he might well possess a weapon."

Wright argues that the district court's inferences concerning the officer's subjective inferences are irrelevant. Specifically, he argues that the proper focus is "not on what the officer himself believes but, rather, on what a reasonable officer in his position would have thought." Espinoza, 490 F.3d at 47; cf. Whren v. United States, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent.") (emphasis in original).

We agree that the proper focus is an objective one, but we disagree that the inferences made by police officers are irrelevant in all instances. The Supreme Court has instructed courts to afford "due weight" to the inferences made by police officers based on their "experience and expertise." See Ornelas, 517 U.S. at 699. In Ornelas, for example, an officer testified that "over the past nine years [he] had searched approximately 2,000 cars for narcotics," and, upon searching the car in that case, noticed a loose panel that he inferred "might have been

-13-

removed and contraband hidden inside." Id. at 693. The Court
stated:

> To a layman the sort of loose panel below the
> back seat armrest in the automobile involved
> in this case may suggest only wear and tear,
> but to [the officer], who had searched roughly
> 2,000 cars for narcotics, it suggested that
> drugs may be secreted inside the panel. An
> appeals court should give due weight to a
> trial court's finding that the officer was
> credible and the inference was reasonable.

Id. at 700.

Here, however, and as the district court admitted, the
officers did not testify to the inferences they purportedly made.
In the district court's words, the officers "did not expressly so
testify" as to their inferences and "the testimony is what it is."
Thus, unlike in Ornelas, the district court did not make
credibility determinations as to the officers' stated inferences.
Nor did the officers testify as to how their "experience and
expertise" provided support for the inferences they made. Instead,
the district court speculated as to what those inferences were,
and, with respect to the second challenged inference, even further
speculated that the inferences were reasonable because the officers
were "competent and experienced police officers in that area of
Boston." We cannot condone such speculation and agree with Wright
that, to the extent that the district court sought to supplement
the historical facts with such inferences, this was improper. Cf.
United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995) (noting,

-14-

in the context of a sufficiency of an evidence challenge, that "[t]he appellate function, properly understood, requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative").

However, we agree with the government that the district court's inferences with respect to the officers' inferences are better understood as implicit conclusions as to what a "reasonable officer . . . would have thought." Espinoza, 490 F.3d at 47. The record strongly suggests that this was the district court's intention. After recounting its findings concerning the events leading up the stop, the district court switched gears and stated "there must be an adequate constitutional basis to chase after [Wright] and seize him under the Fourth Amendment, and it is to that issue that the Court now turns." (Emphasis added). Thus, the district court indicated that it was switching from its factual findings to its ultimate reasonable suspicion analysis. This is confirmed by the district court's following statement that "[t]hese are mixed issues of fact and law," which is not true of the district court's findings of historical fact, but is true of its ultimate determination whether reasonable suspicion exists in this case. See Ornelas, 517 U.S. at 696 (noting that "[t]he first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact").

Construing the district court's inferences as inferences that a reasonable officer would have made does not end the matter. To the extent that the district court's inferences are factual inferences drawn from the historical facts, they are subject to clear error review, "mindful throughout that when two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous." Espinoza, 490 F.3d at 46. To the extent that the district court's inferences are ultimate conclusions as to what a reasonable officer would have concluded based on the historical facts, and thus conclusions as to whether reasonable suspicion exists, those conclusions are subject to our de novo review.

Having reviewed the historical facts, we turn to whether those facts support reasonable suspicion in this case.

## 2. **The Reasonable Suspicion Analysis**

In its analysis, the district court reviewed the historical facts in sequence, building upon each prior event in determining whether a reasonable officer would have reasonable suspicion to stop Wright. For example, the district court noted that, upon observing Wright leaning forward, that, at that point in time, the officers "had no right to seize [Wright] under the Fourth Amendment." Only later, after subsequent events, did the district court rule that it "was constitutionally appropriate" to stop Wright.

We take the same approach. We review the sequence of events, and any reasonable inferences drawn from those events, to determine whether the officers had reasonable suspicion to stop Wright. After examining this sequence and the totality of the circumstances, we conclude that they had such reasonable suspicion.

### a. Leaning Forward

We begin with the officers' testimony that they observed Wright "lean forward" from the backseat.[5] Although Wright does not

---

[5] On appeal, the government also points out that the recognition of Omar Edwards by Officer Brown should be considered in determining reasonable suspicion. The government contends that Edwards was a recent shooting victim and, thus, contributes to a reasonable suspicion that Wright was engaged in unlawful activity. See United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) (upholding inference that "victims in gang-area shootings often were gang members themselves and tended to congregate with other gang members"). However, there was no evidence that Wright was connected to the Edwards shooting to permit an inference that Wright (and not Edwards) may be involved in similar activity. Moreover, Officer Brown, the officer who recognized Edwards, testified that he did not attribute anything unusual to Omar Edwards' presence, stating "it didn't strike me as odd" that he was there, as "he lived in the area," "[h]e had a girlfriend or something that I thought that lived there," and "I know he had friends that lived in one of those gray houses." Because of the lack of any connection of Edwards's shooting to Wright and the fact that there were no other particularized facts suggesting that Edwards's presence was suspicious, we conclude that a reasonable officer would not infer from the presence of Edwards that Wright was acting suspiciously.

This is not to say that Edwards's presence at the scene is entirely irrelevant. A reasonable officer might not find a shooting victim's presence unusual, but nevertheless could still have a heightened interest in the vehicle in part because of the victim's presence. Although Brown's presence does not by itself suggest suspicious conduct by Wright, it is part of the melange of background facts explaining why an officer would reasonably focus on the activities of the vehicle's occupants.

-17-

dispute that he leaned forward when the lead car passed and parked in front of the car in which he was sitting, the district court made a further finding as to what a reasonable officer would have inferred from that action:

> I do think that it is a reasonable inference from Officer Bordley's testimony that Officer Bordley thought . . . that Mr. Wright had made the unmarked police car that had parked in front.

Again, we note that although the district court attributed this inference to Officer Bordley, this inference is better understood as one a reasonable officer would have made.

Implicit in the district court's conclusion is that a reasonable officer would have inferred from Wright's leaning forward that Wright attempted to identify the lead car. Officer Bordley, in fact, expressly testified that Wright leaned forward "to observe the unmarked motor vehicle that had pulled over." Since this inference is "plausible . . . based on the raw facts as supportably found," Espinoza, 490 F.3d at 48, we consider it in our analysis.

But the district court went even further and concluded that a reasonable officer would have inferred that Wright "made," that is recognized, "the unmarked police car that had parked in front." We only credit such a factual inference to the extent that it has some basis in the record or upon the "background facts" known by the district court. See Ornelas, 517 U.S. at 699.

-18-

We conclude that the evidence supports a reasonable inference that Wright "made" the lead car as a police car. In United States v. Aitoro, for example, we concluded that it was reasonable for the officers to stop two suspects who, upon seeing them in plainclothes, exclaimed "Oh, shit" prior to fleeing. 446 F.3d 246, 252-53 (1st Cir. 2006). Granted, Wright did not state "Oh, shit" or any other exclamation that was indicative that he recognized the officers. However, Wright was observed leaning forward in an attempt to identify the unmarked cars, and, shortly thereafter, quickly exiting from the car. While less colorful than the expression "Oh, shit," the timing of Wright's conduct in quickly exiting the car after leaning forward would permit a reasonable officer to infer that Wright "made" the lead car as a police car.

On appeal, Wright contends that an inference that Wright "made" the lead car as a police car is unreasonable because the police cars in this case were unmarked. We disagree. In Aitoro, the officers were in plain clothes, and we did not require evidence of the recognizability of the officers by the suspect to support an inference that the suspect recognized the officers in fleeing.[6] In

_____

[6] In Aitoro, we noted in a footnote that the officers "stood out like a sore thumb in the area" and that "[o]ne wore a BPD baseball shirt, while the other two were visibly equipped with handcuffs, flashlights, and police identification." Id. at 249 n.2. We similarly note here that, although in plain clothes and in unmarked police cars, the officers' presence was not opaque. Officer Celester testified that "[s]ometimes we wear shirts that say Boston

-19-

fact, in response to the suspect's argument that it was "dubious" to conclude that he recognized the officers given that they "were not in uniform and were standing perhaps 80 feet from the corner when Aitoro and Williams came around the bend," we stated:

> The reasonableness of a [stop] entails an objective inquiry into the [stop] from the perspective of the . . . officers, however, <u>so what is relevant is not whether Aitoro actually perceived the officers as police officers</u>, but whether the officers reacted reasonably on seeing him flee.

<u>Id.</u> at 253 (emphasis added). Thus, like in <u>Aitoro</u>, where the suspect's exclamation of "Oh, shit" permitted the officers to infer that they were recognized, here Wright's actions in leaning forward and shortly thereafter exiting the car are also sufficient to permit a reasonable officer to "react[] reasonably" and infer that Wright "made" the unmarked car as a police car.

### b. Running Southward

The parties do not dispute that Wright, shortly after leaning forward, exited the car in which he was sitting and started running southward, away from the lead car. The district court, in describing the running, stated that:

---

Police Youth Violence Strike Force on them," and further testified that the officers "always have our badges on us displayed like a chain like I have now. We always have it out." We further note that Officer Brown recognized Omar Edwards in the car, and it would have been reasonable for the officers to conclude that Edwards similarly recognized Officer Brown as a police officer and communicated that information to the rest of the occupants in the car, including Wright.

-20-

> I infer from the testimony that, though things happened in split second intervals, Mr. Wright had started to run, I do not at this point say flee, he had started to run before the officers had started to run after him.

On appeal, Wright seizes on the district court's use of the term "flee," and argues that the district court made an express finding that Wright's running southward does not constitute "flight." We disagree, because the district court found all of the factual components necessary to support a finding of flight. We thus conclude that the district court's statements cannot be reasonably read as a finding that Wright's running did not constitute flight.[7]

Although not strictly defined, the Supreme Court in Wardlow described "flight" as the "unprovoked" running "upon noticing the police." 528 U.S. at 124 (noting that "unprovoked flight upon noticing the police" contributed to the officers' reasonable suspicion in that case, and that "[h]eadlong flight -- wherever it occurs -- is the consummate act of evasion"). As we have previously concluded, the district court reasonably inferred that Wright "made" the lead car. Moreover, and as clumsily noted by the district court above, Wright "had started to run before the officers had started to run after him," which is supported by the officers' testimony. Accordingly, Wright's running was "unprovoked

---

[7] In the alternative, we conclude that, to the extent that the district court found that there was not flight, such a finding was clearly erroneous, since we have a "'definite and firm conviction that a mistake has been committed.'" See Espinoza, 490 F.3d at 46 & n.1 (quoting Gypsum, 333 U.S. at 395).

-21-

. . . upon noting the police."

Wright argues on appeal that his running could not be interpreted as flight because, in exiting the car, he ran in the direction of the other unmarked police cars, which were behind the car in which Wright was sitting. While true, this fact does not defeat a finding of flight. As an initial matter, and as pointed out by the government, the unmarked police cars were not directly behind the car in which Wright was sitting. Although the testimony showed that Wright's car was in the parking lane, the other police cars were, as testified to by Officer Bordley, "stopped in the flow of traffic," just to the right of the parking lane. Moreover, Wright's recognition of the police cars after leaning forward was only as to the lead car. Thus, in identifying the lead car as a police car, Wright, like the suspects in Aitoro, "did an abrupt about-face and sprinted in the reverse direction." 446 F.3d at 249 (internal quotation marks omitted). As events occurred "in split second intervals," Wright did not have a great deal of time to identify the unmarked cars that were roughly ahead of him and change course accordingly.

### c. Clutching

The parties do not dispute that, while running, Wright made a clutching or grabbing motion to his sweater. However, the district court included a further inference as to what a reasonable officer would have inferred from that clutching:

> I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed his side, clutched at something in his sweatshirt. The Court infers that the officers did in that split second draw the inference that he might well possess a weapon.

As with the district court's earlier inference concerning whether Wright "made" the car, we construe the Court's "infer[ence]" as one that a reasonable officer would have made.[8]

The evidence certainly supports a reasonable inference that Wright clutched at contraband. Wright made his clutching motion while in flight, which supports a reasonable inference that, whatever he was trying to secure, he wanted to keep it from the officers. In fact, all of the officers testified to the closeness of the clutching motion to his running away from the lead car. Officer Bordley testified that Wright "grabbed his sweater, took off running" and that, shortly thereafter, "[h]e grabbed his sweater on the right side where the right pocket was." Officer Celester also testified that, shortly after Wright "jumped out and ran," he "appeared to pull something out of his waist area" and that "[h]e was tugging with his right hand" around his "waist

---

[8] In stating that it relies upon the officers' expertise in "that area of Boston," the district court, at first glance, seems to factor in the character of the area in support of its inference that Wright was clutching at a weapon. Any such indication is negated by the district court's later finding that the area was not a high-crime area. Moreover, in context, the reference is better read as an appeal to the expertise of the officers, rather than any characteristics of the area.

area." Finally, Officer Brown testified that he observed "the rear passenger exit the vehicle, stand up, and . . . he immediately turned to his right and he grabbed onto like his sweatshirt pocket," and further demonstrated where he grabbed the pocket, stating to the district court that he "grabbed onto his hood sweatshirt pocket right around here and began to run up Blue Hill Avenue."

On appeal, the government "does not believe the inference that Wright might possess a gun is essential to reasonable suspicion," but nonetheless argues that the evidence supports such an inference. We agree that the inference that Wright "might well possess a gun" is not essential, as the evidence is sufficient to support an inference that Wright was clutching at contraband, but disagree that the evidence supports such an inference. The government first argues that the district court found on remand that the object in Wright's pocket was "heavy," but the weight of the contents of Wright's pocket does not support an inference that the pocket contains a <u>weapon</u>, as opposed to some other object. Moreover, the government argues that "the court could also have considered that guns are with some frequency carried in the pockets or waist area and police know this." <u>See</u>, <u>e.g.</u>, <u>Aitoro</u>, 446 F.3d at 249 (noting that the officer there "saw Aitoro grab at the waist of his pants, where [the officer] saw a bulge that he thought was a gun); <u>United States</u> v. <u>Woodrum</u>, 202 F.3d 1, 5 (1st Cir. 2000)

-24-

("When he freed his right hand and exited the taxi, a gun fell out of his jacket."); United States v. Alston, 112 F.3d 32, 33 (1st Cir. 1997) ("Realizing that there was a gun in the pocket, the officer removed it and arrested Alston."). But, again, the fact that guns are frequently found in pockets (where else would they be?) does not provide support for an inference that Wright was carrying a weapon as opposed to something else that is frequently kept in pockets, such as keys. Finally, the government points to the presence of Omar Edwards to support an inference that Wright was armed; however, we have already concluded that his presence does not support a suspicion that Wright was engaged in similar criminal activity. Thus, the fact that Wright clutched at his pocket, even while in flight, cannot support an inference that the object he clutched was specifically a weapon, and it was clear error for the district court to so infer. See United States v. McCoy, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood").

### d. Refusal to Stop

Unlike the other facts so far discussed, Wright's refusal to obey the officers' order to stop, without a doubt, contributes to a reasonable suspicion. Thus, as we have previously held, the

failure to heed an officer's order, while not conclusive of reasonable suspicion itself, is supportive of it. See, e.g., United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008) (holding that a defendant's refusal to follow police orders to keep still and keep hands visible contributed to reasonable suspicion that suspect was armed and dangerous). Other courts have so held. See United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003) ("A suspect's failure to halt upon police command to do so," along with other factors, "support a finding of reasonable suspicion."); United States v. Johnson, 212 F.3d 1313, 1316-17 (D.C. Cir. 2000) (fact that suspect did not comply with order to put hands up but continued to make motions consistent with hiding or retrieving something contributed to finding of reasonable suspicion); United States v. Valentine, 232 F.3d 350, 358-59 (3d Cir. 2000) (citing cases finding failure to comply with police orders supported reasonable suspicion).

### e. The Totality of the Circumstances

We have noted that, in conducting a reasonable suspicion analysis, "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance." Ruidíaz, 529 F.3d at 30. Accordingly, in our prior decisions we have upheld Terry stops where the combination of "innocuous" facts culminates in reasonable suspicion. See, e.g., id. at 30-32 (combination of reliable tip from a 911 caller plus belligerence of suspect

-26-

resulted in reasonable suspicion); Soares, 521 F.3d at 120-21 (combination of time of night, high-crime area, and unusual behavior resulted in reasonable suspicion); United States v. Romain, 393 F.3d 63, 72 (1st Cir. 2004) (combination of 911 call, suspect's visible agitation, and suspect's belligerence resulted in reasonable suspicion).

Here, reasonable suspicion arises not just from the combination of facts, but from their progression. We have previously held that reasonable suspicion can be based on "unfolding events," with suspicion accumulating as more innocent interpretations of the historical facts fall by the wayside. United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998) ("Based on unfolding events, the trooper's attention (and, thus, his reasonable suspicions) shifted away from the equipment violations that prompted the initial stop toward a belief that the detainees were engaged in more serious skulduggery. Such a shift in focus is neither unusual nor impermissible."); see also Soares, 521 F.3d at 120 ("Several additional facts became known as the stop progressed, which, taken together, created reasonable suspicion that Soares might be armed and dangerous.").

So it is here. In this case, the lead police car was first drawn to the car in which Wright was sitting when it parked and partially blocked an entrance to a mini-mart. In short order, Wright leaned forward, quickly exited from the car as if

-27-

recognizing the lead car as a police car, ran in the opposite direction of the lead car, clutched at his side, and, crucially, refused to stop when ordered to do so. As is clear from the discussion above, each event recast each previous event in a different light, such that, by the time that Wright refused to stop, there was sufficient suspicion to question why he had leaned forward, exited the car, clutched, and started running.

We conclude by emphasizing that the issue here is not whether Wright's conduct could lead a reasonable officer to conclude that it was certain that he was engaged in criminal activity, or even that it was more probable than not that he was engaged in such activity. Rather, the Supreme Court has stressed that a Terry stop is permitted even if "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." Wardlow, 528 U.S. at 125. In fact, "the very purpose of [Terry] stops is to clarify ambiguous situations." 2 LaFave et al., Criminal Procedure § 3.8(d), at 327 (3d ed. 2007). We conclude, based upon our review of the record, that Wright's actions were sufficiently ambiguous as to whether there was criminal activity afoot to justify the stop in this case.

Accordingly, we conclude that the totality of the circumstances supports the district court's conclusion that the officers had reasonable suspicion to stop Wright.

### III.  <u>Conclusion</u>

For the foregoing reasons, the denial of Wright's motion to suppress is affirmed.

**<u>Affirmed</u>**.

**"Dissenting opinion follows"**

**LIPEZ, <u>Circuit Judge</u>, dissenting.** The majority concedes that the district court's most critical factual finding – that the officers believed Wright might be carrying a gun – lacks record support. It nevertheless manages to uphold the court's ultimate finding of reasonable suspicion. It does so by creatively interpreting or recasting other findings of the court, filling in the gaps with its own speculation, and avoiding the district court's explicit reliance on the location of the stop – "that area of Boston" – in its reasonable suspicion analysis. As I shall explain, the facts and inferences actually supported by the record do not provide a sufficient foundation for the finding of reasonable suspicion. Moreover, the district court's reliance on the character of the neighborhood after declining to find it was a "high crime area" is a far-reaching error that should not be ignored. I therefore respectfully dissent.

## I.

The majority reviews the events leading up to Wright's stop in sequence, addressing Wright's challenges to the inferences the court drew from the historical facts as part of its scrutiny of each of Wright's four significant behaviors: (1) leaning forward from the backseat of the car in which he was a passenger; (2) quickly exiting the vehicle and running down the street; (3) tugging at the right side of his sweatshirt; and (4) ignoring the officers' orders to stop. I take a similar approach, but begin by

focusing on Wright's challenge to the two specific inferences challenged by Wright: first, that Officer Bordley believed Wright had identified the police car and, second, that several officers who saw Wright running suspected he was carrying a weapon. Once the landscape of permissible facts and inferences is established, I explain why the totality of those circumstances fails to establish a reasonable suspicion that Wright was engaged in criminal activity.

## A. The Court's Inferences about the Officers' Beliefs

### 1. The Role of Deference

Trial courts unquestionably have the "superior vantage point" in examining the circumstances alleged to support reasonable suspicion, United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007), and "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). Deference is owed to the trial judge's ability to "view[] the facts of a particular case in light of the distinctive features and events of the community," and the police officers' similar ability to see the facts in light of their "experience and expertise." Id. The background facts known by the court and officers "provide a context for the historical facts, and when seen together yield inferences that deserve deference." Id.

Notwithstanding a trial judge's general familiarity with a community, the judge's findings on the facts underlying a particular seizure must draw support from the evidence in the record. Such evidence frequently will include the officers' own stated inferences about what they saw and heard. In Ornelas, for example, where the Supreme Court examined the applicable standard of appellate review for trial court rulings on reasonable suspicion, the seizure at issue occurred after a deputy who was searching the interior of a car noticed that a door panel felt loose. Deputy Luedke "suspected that the panel might have been removed and contraband hidden inside," and he discovered two kilograms of cocaine when he dismantled the panel. Id. at 693. Luedke testified that a rusty screw near the loose panel indicated to him that the screw had been removed at some time. Although the Supreme Court in Ornelas rejected deferential review for "ultimate determinations of reasonable suspicion," id. at 697, it emphasized that reviewing courts must defer to district court findings on underlying facts and inferences such as those reported by Luedke.

> To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.

Id. at 700.

## 2.  Deference in this Case

The hierarchy of review described by the Court in <u>Ornelas</u> – an appellate court giving due weight to the trial judge's finding that the officer's stated inference was reasonable – cannot be applied to the inferences that are challenged here.  The findings at issue – Officer Bordley's belief that Wright had "made" the police car and that the officers believed Wright had a gun in his pocket – were drawn solely by the court, without any testimony from the officers, to whom the inferences were attributed.  Bordley did not testify that he believed Wright had identified the police car, but only that he had seen Wright lean forward to look at the unmarked cruiser.  None of the three officers who testified that Wright grabbed or tugged at the right side of his sweatshirt as he ran reported a belief that he was carrying a weapon.  Officer Brown stated that, once Wright got out of the car, "he turned to his right, grabbed onto his hooded sweatshirt pocket right about here and began to run up Blue Hill Avenue."  Officer Celester testified that Wright was "tugging" at his clothes with his right hand, in his "waist area," and that he "appeared to be trying to pull something out of his waist area."  Officer Bordley said that Wright "stepped out of the motor vehicle, grabbed the right side of his sweater and took off running up Blue Hill Avenue."

Importantly, although Officer Celester's testimony in particular supports an inference that the officers believed Wright

-33-

was carrying something in his pocket, nothing in any of the testimony provided a basis for the court to conclude that the officers believed the item to be a weapon. They did not say that he seemed to be carrying something heavy. They did not report seeing a gun-like bulge in his pocket. This case would be very different if there had been such testimony. If the officers had reported some characteristic particularly suggestive of a weapon, the court could have based its conclusion that they inferred Wright was carrying a gun on that observation – even without the explicit statements usually provided by officers as to their belief. See United States v. Aitoro, 446 F.3d 246, 249 (1st Cir. 2006) (noting that police officer "saw a bulge that he thought was a gun"); cf. United States v. Moore, 235 F.3d 700, 702 & n.1 (1st Cir. 2000) (noting that officer, who reported seeing defendant holding his hand "clenched at his side as if he was attempting to conceal something in it," testified that he thought it might be a weapon or contraband). The district court thus drew an inference on behalf of the officers that they did not articulate themselves, and the inference relies on no fact suggesting that Wright had a gun, rather than some other, lawful item, in his pocket. When someone runs with something – anything (a cell phone, a wallet, a pack of cigarettes) – in the front pocket of a sweatshirt, it is natural to try to secure it.

Given the importance of the officers' "experience and

expertise" in identifying possible criminal activity, and the natural inclination of officers to draw upon that experience in explaining the significance of conduct that they have observed, I am troubled by the district court's reliance on speculation to assign the officers a state of mind that they could have – but did not – disclose through their testimony.  I understand that the reasonable suspicion determination does not turn on "what the officer himself believed but, rather, on what a reasonable officer in his position would have thought." Espinoza, 490 F.3d at 47; see also United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008) ("Reasonableness in this context is a construct that must be judged according to objective criteria . . . .").  In its effort to rewrite the district court's decision, the majority concludes that the court's statements about the officers' beliefs could be interpreted as an imperfect way of expressing the court's view that reasonable officers would have concluded that Wright had recognized the police cruiser and would have believed that he might be carrying a weapon.  Even if that rephrasing accurately reflected the court's findings, however, my concern would remain.

Where the officers themselves had the opportunity to attribute a suspicious connotation to conduct they observed, but did not do so, the court's speculative inferences are seriously weakened.  The officers on the scene are in the best position to assess the significance of the developing facts, and the officers

-35-

here had every incentive to fully explain why they believed they were justified in detaining Wright. Their failure to articulate the beliefs the court attributes to them may indicate that they lacked such perceptions of Wright's conduct, but whatever the reason for their silence, the court's inferences about what a reasonable officer could have believed lacked an important factual indicator of such reasonableness – the expressed beliefs of the officers on the scene. Cf., e.g., United States v. Dubose, No. 08-2382, 2009 WL 2712322, at *3 (Aug. 31, 2009) (reporting officer's testimony that he became suspicious because of defendant's actions, including that defendant's "conduct was similar to the conduct involved in other drug transactions in the area"); (United States v. Soares, 521 F.3d 117, 118, 120 (1st Cir. 2008) (reporting officer's testimony that movements in a car in which the defendant was a passenger "concerned him" and that officers saw "'furtive movements'" that were "'not ordinary'"); United States v. Taylor, 511 F.3d 87, 89 (1st Cir. 2007) (describing officer's testimony that his "suspicions [were] aroused by [the defendant's] uncharacteristically nervous demeanor and furtive movements"); United States v. Baskin, 401 F.3d 788, 792 (7th Cir. 2005) (describing officer's testimony that her "suspicions were aroused" by the defendant's driving); United States v. Chhien, 266 F.3d 1, 4 (1st Cir. 2001) (describing officer's increasing suspicions during questioning of defendant); United States v. Montero-Camargo,

208 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (describing officer's testimony about conduct by the defendants that had "aroused [the officer's] suspicions").

Having stated my more general concern about inferences founded only on speculation, I turn to closer scrutiny of the two specific findings at issue.

### 3.  "Making" the Police Car

The district court's first step in drawing the inference that Bordley believed Wright had identified the unmarked car as a police cruiser was unremarkable.  Bordley testified that he saw Wright lean forward from the backseat of the car "to observe the unmarked motor vehicle that had pulled over," and the court apparently inferred from that testimony that the officer believed Wright was making an attempt to identify the vehicle or its occupants.  That inference from Bordley's testimony was certainly reasonable.

In building on that initial inference, however, the court evidently relied on its own familiarity with Dorchester and the area's law enforcement practices to conclude that Wright would have recognized the car as a police cruiser.  During the original evidentiary hearing, the trial judge stated that this inference was "drawn from both this case and my presiding over time."  He explained:

> [M]y natural inference is that though the
> police are in those areas in unmarked cars and

in plain clothes, the cars are readily identifiable to those people who interest themselves in what the police are driving. And that includes people who are absolutely lawfully about, shopkeepers, people about their business who once have been the victim of a crime or the members of their family [have been] victim[s] of a crime. The police, because they buy in bulk to save money, they're driving Crown Victorias.[9]

The court's own knowledge of the common use of Crown Victorias as police cars not only led it to infer that <u>Wright</u> must have recognized the car as a police cruiser, but also led it to infer that <u>Bordley</u> thought that Wright had recognized it as such. The court's inference about Bordley's thought process thus depended on its treatment of public recognition of unmarked police cars as a matter appropriate for judicial notice – an approach that I cannot sanction. <u>See</u> Fed. R. Evid. 201(b) (stating that a judicially noticed fact must be either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). There is no ready means to evaluate the accuracy of the court's inference, and there

---

[9] In the original hearing, the court had stated that, when Wright leaned forward, "he saw that it was an unmarked police officer[sic], he knowledgeably recognized it as such." During the remand hearing, the court did not explicitly attribute this knowledge to Wright, instead referring only to the inference drawn by Bordley. The court also did not repeat the common-knowledge explanation to support its finding on Bordley's inference. I think it is a fair assumption that it relied on the same rationale, however, because the record contained no new evidence.

is likewise no basis for deeming public recognition of Crown Victorias to be "generally known" in Boston.

Moreover, allowing the district court to rely on its own knowledge, rather than evidence in the record, has the undesirable consequence of preventing the defendant from testing the inference through the adversary process. Indeed, the court's statement that "the cars are readily identifiable to those people who interest themselves in what the police are driving" does not tell us why the court concluded that Wright in particular – at the time he exited his vehicle – would have been likely to have such knowledge. Cf. United States v. Southard, 700 F.2d 1, 26 (1st Cir. 1983) ("It is one thing to take judicial notice of the driving time between New Haven and the Rhode Island line. It is quite another to use this fact as a basis for a finding that the defendant actually knew it.").

Furthermore, the need for record support for such an inference is implicit in our decision in United States v. Taylor, 511 F.3d 87 (1st Cir. 2007), which also involved a motion to suppress a firearm seized during an investigatory stop. There, we rejected the defendant's claim that the police had seized him at the moment an unmarked Crown Victoria parked behind his vehicle because, among other reasons, there was no evidence that the defendant knew the Crown Victoria was a police car until he recognized one of the officers when the officer approached the

defendant's car. Id. at 92. The District of Columbia Circuit also has flagged the issue, questioning the propriety of crediting a police officer's testimony that his unmarked car was "one of those ones that everybody knows it's a police cruiser" in the absence of a factual foundation on "public identification of police vehicles." United States v. Johnson, 212 F.3d 1313, 1316 (D.C. Cir. 2000).

District court judges unquestionably have license to make common-sense judgments about the circumstances surrounding police stops. Such extra-record fact-finding, however, must be limited to background matters that cannot reasonably be disputed. Wright's knowledge of unmarked police cruisers is not such a matter. I therefore reject as unsupported the court's inference that Bordley – or any reasonable officer – would have concluded, based on Wright's leaning forward from the backseat, that Wright had recognized the unmarked cruiser as a police car.[10]

---

[10] The majority ignores the lack of factual support for the court's conclusion that Wright identified the Crown Victoria as a police cruiser. Instead, it offers its own flawed speculation, concluding that a reasonable officer could have inferred that Wright "made" the car based on his quickly exiting the vehicle in which he was riding. But the critical factual question that makes Wright's identification of the police car relevant is whether Wright quickly exited and ran because he saw the police officers – making his quick exit from the car and his run down the street suspicious. His running, then, cannot be the basis for the conclusion that he recognized the car as a police vehicle. Such reasoning is circular and unsupportable. In addition, I do not understand how the majority can equate the quick exit from the car – conduct that itself reflects no state of mind – with the revealing exclamation "oh shit" in supporting an inference that Wright was running from the police.

## 4. The Belief that Wright was Armed

The omission of testimony from the officers is even more troubling with respect to the court's finding that the officers believed that Wright was armed.[11] This finding involves conduct that is not ordinarily lawful (carrying a concealed weapon), and it goes to the heart of the reasonable suspicion analysis. The officers' failure to testify to their beliefs about the significance of the conduct that they observed is not a mere technical gap in the evidence. As noted above, the adversary

---

The majority's strained suggestion that Wright could have recognized the officers because they always wore badges or police department shirts is also unpersuasive. Wright was sitting in the back seat of a car that was behind the car he leaned forward to see. It was 7:45 p.m. in November – undoubtedly after dark. Even if the officers were wearing badges any inference that Wright saw them is unsupported and unreasonable on this record.

Finally, the majority creatively speculates not only that the officers reasonably could have believed that Omar Edwards recognized Officer Brown as a police officer, but also that he communicated that information to Wright. Many scenarios are possible, of course, but there is no factual support for such speculation. An appeals court cannot simply make up inferences to fill in the gaps in the record. Moreover, none of these arguments was made by the government.

[11] The district court explained its inference that the officers who saw Wright run down Blue Hill Avenue believed he might have a gun as follows:

> The Court infers, and again the testimony is what it is, it's not explicit, I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed his side, clutched at something in his sweatshirt. The Court infers that the officers did in that split second draw the inference that he might well possess a weapon.

-41-

process depends upon the ability of defense counsel to cross-examine witnesses about their observations and the inferences that they drew from them.  If, for example, any of the officers here had testified that he suspected Wright of carrying a weapon, defense counsel could have asked why he drew that inference.  The officer may have been able to explain why, based on past experience or more detailed observations, he drew the inference.  On the other hand, the officer's response may have revealed that he had no basis for believing that Wright might be carrying a weapon.  Cf. Espinoza, 490 F.3d at 47 (noting that the district court, after hearing the arresting officer's testimony, found that his rationale for following the defendant's van and commencing an investigation "was bottomed on a pale patina of facts" and that the officer's actions were "'based on nothing more than a hunch'").  Indeed, the evidentiary gap may have occurred because Wright's hand motion did not in fact cause the officers to suspect that Wright might be carrying a weapon.

Two additional problems also are of critical significance in my assessment of the weapon inference: (1) the court's reprise of backwards reasoning, and (2) its reliance on the character of the location, despite its finding that the events did not occur in a "high crime area" within the meaning of Illinois v. Wardlow, 528 U.S. 119 (2000).

### a. Backwards Reasoning

In announcing its ruling, the district court acknowledged that the inferences it drew were based in part on the officers' reaction to Wright: "I draw inculpatory inferences . . . from what I infer was the observations of the officers and their response, their immediate order to Mr. Wright to stop . . . ." The court's approach was thus doubly flawed with respect to its inference that the officers believed Wright might possess a weapon. First, the inference was speculative because it lacked support from any testimony from the officers or other evidence (such as evidence of a bulge in Wright's pocket). Second, the court drew the inference, in part, based on the officers' reaction. Given that the question in a reasonable suspicion analysis is whether the officers could lawfully take the action they took, their conduct will always support a suspicious inference. The question is whether the defendant's actions or appearance permitted the inference of suspicious conduct that would justify the officers' conduct – namely, that Wright might possess a weapon. The court's inferential process was again impermissibly circular: because the officers ran after Wright and ordered him to stop, they must have thought he could be carrying a weapon. But the officers did not profess such a belief, and neither the officers nor the court cited facts that would support such an inference, apart from references to "that area of Boston."

### b. The Character of the Area

The district court's analysis suggests that the neighborhood where the events occurred heavily influenced the inference concerning Wright's possession of a gun. The court twice invoked the location of the arrest in explaining its ruling. First, in drawing the inference that the officers suspected that Wright "might well possess a weapon," the court stated:

> I infer that the officers ascribed some significance as they are competent and experienced police officers in that area of Boston to the fact that Mr. Wright grabbed at his side, clutched at something in his sweatshirt.

Second, in addressing the question of high crime area, the court stated that it was honoring "what I infer is the police officers' experience and knowledge of the communities which they patrol." In the latter context, however, the court went on to say that it would have reached the same conclusion on reasonable suspicion "if the officers had acted in the same fashion in Wellesley or Milton" – locations that the court appeared to contrast with Dorchester because of lower levels of violent crime.

There are troubling inconsistencies in the court's remarks.[12] The court declined to find that the location was a "high

---

[12] Rather than confronting these inconsistencies and the district court's clear reliance on the nature of the area – as well as the government's argument that the court properly did so – the majority chooses to ignore the problem and read the court's reference to "that area of Boston" as "an appeal to the expertise of the officers." In my view, this convenient recasting of the record is

-44-

crime area" within the meaning of Wardlow – a finding that would have given the character of the area significance in the reasonable suspicion inquiry.   In explaining that conclusion, the court emphasized that an individual's behavior, and the overall circumstances surrounding a police stop, must be given the same particularized scrutiny, no matter where they occur, to ensure "that the rights of the citizens in the Dorchester area of Boston [are] identical to the rights of the citizens in Milton and Wellesley."  These remarks reflect the unexceptional principle that residents of poorer urban neighborhoods, where crime typically is more prevalent than in nearby suburban communities, cannot be seen as more likely to be involved in criminal activity simply because of where they live.  See Andrew Guthrie Ferguson & Damien Bernache, The "High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, 57 Am. U. L. Rev. 1587, 1589 (2008) [hereinafter The "High-Crime Area" Question] (noting that the Supreme Court "has never yet allow[ed] the character of the neighborhood to be the sole justification for a stop based on reasonable suspicion").

        Yet, the court's actual analysis belied this articulation of the law.  Despite rejecting the specific high crime area finding, the court factored the officers' awareness of criminal

---

an unsupportable reading of the court's words and a regrettable avoidance of one of the most troubling aspects of the district court's decision.

activity in "that area of Boston" into its assessment of how a reasonable officer would perceive Wright's "clutching at something in his sweatshirt." The court apparently concluded that a reasonable officer, knowing the criminal history of the area, would be entitled to think that Wright's hand movement indicated that he might be carrying a weapon in his pocket.

The government endorses this two-tiered approach to the character of the area, arguing that the prevalence of crime is properly considered even if the location is not found to be "a 'high crime area' in the <u>Wardlow</u> sense." The government, which does not argue on appeal that the court's <u>Wardlow</u> determination was incorrect, stresses that the stop occurred in a location that the officers on the scene nevertheless associated with assorted crimes. It contends that their perception – supported by their testimony at the suppression hearing[13] – should be given weight in evaluating their response to Wright's behavior.

The government's argument has large implications. In our earlier decision in this case, we observed that the evidence

---

[13] Officer Bordley stated that the neighborhood around the 1200 block of Blue Hill Avenue has a "level of criminal activity [that] would be considered high for that area," with "[n]umerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature." Officer Celester testified that "we were experiencing a lot of crime . . . during that period, so we were doing a lot of proactive policing" and said the officers would "aggressively patrol areas, targeting gangs and things like that." Officer Brown testified that he had responded to "several shootings [and] drug investigations in that area."

relevant to a high crime area finding ordinarily should include some combination of factors showing a link between the incidence of specific criminal activity in the area and the police officers' suspicions about the defendant. After all, the reasonable suspicion justifying a <u>Terry</u> stop must be more than an "inchoate and unparticularized suspicion or 'hunch,'" <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 27 (1968), and it must be specifically focused on the individual under scrutiny. When the officers have specific background knowledge about that individual, they are able to view his conduct in light of their prior information. In <u>United States</u> v. <u>Am</u>, for example, we deemed the location of a <u>Terry</u> stop a permissible consideration in a firearms case where the officers knew enough about the history of the defendant to conclude reasonably that he would be unlikely to walk unaccompanied in that area – known for gang violence – unless he were armed. <u>See</u> 564 F.3d 25, 28 (1st Cir. 2009).

Where the officers have no personal knowledge of the defendant, however, the relevance of any background knowledge – including the character of the neighborhood – logically depends on whether it contributes to particularized suspicion concerning the individual under observation. A high incidence of crime in an area may provide such a link when the evidence establishes a similarity between the crimes that most commonly occur there and the crime suspected in the instant case. <u>See</u> <u>United States</u> v. <u>Wright</u>, 485

F.3d 45, 54 (1st Cir. 2007) ("Wright I") (requiring a "nexus" between the crime prevalent in the area and the crime suspected). The strength of that link will turn, inter alia, on both temporal proximity – how recently did such prior, similar crimes occur? – and whether the geographic boundaries of the "area" or "neighborhood" under scrutiny are limited. Id.

Such factors bring discipline to the high crime area designation by establishing limiting principles that will assure, in the district court's words, "scrupulously identical" constitutional protection for residents of crime-ridden neighborhoods as for other individuals, guarding against detentions rooted only in generalized perceptions. The factors link a neighborhood's experience with crime to the defendant's observed conduct and thus give substance to the requirement of particularized suspicion. A police officer who knows that crimes of a certain type have recently been occurring in a sensibly circumscribed area could expect more such crimes there, reasonably increasing the officer's suspicions about conduct suggestive of such a crime. Without a link to recent similar crimes, however, there would be less reason to treat equivocal conduct as suspicious – and more risk of an unjustified stop. See Johnson v. Campbell, 332 F.3d 199, 210 (3d Cir. 2003) ("[W]hen a stop is not based on specific, objective criteria, 'the risk of arbitrary and abusive police practices exceeds tolerable limits.'" (quoting Brown v.

-48-

<u>Texas</u>, 443 U.S. 47, 52 (1979))).

Establishing a link between the defendant's observed conduct and the high crime area designation is essential in protecting individual rights because of the decisive impact of that designation in the reasonable suspicion calculus. When it applies, every observed act is viewed through a more suspicious lens, and commentators have observed that "a high-crime area designation almost always shifts the analytical balance toward a finding of reasonable suspicion." <u>The "High-Crime Area" Question</u>, 57 Am. U. L. Rev. at 1590. This weighting is appropriate only if the designation in fact "makes an officer's 'suspicion' about otherwise innocent conduct in that area more reasonable." <u>Id.</u> at 1635.

Such a particularized focus in the high crime area designation was implicit in <u>Wardlow</u>, where the defendant was arrested for drug activity. The Supreme Court noted that the officers were "converging on an area known for heavy narcotics trafficking in order to investigate drug transactions," and they were traveling in a four-car caravan "because they expected to find a crowd of people in the area, including lookouts and customers." 528 U.S. at 121. The law enforcement focus was thus directed toward current and ongoing drug trafficking. Wardlow was observed standing next to a building holding an opaque bag, and he fled after looking in the direction of the officers. <u>Id.</u> at 121-22. The officers suspected Wardlow of narcotics activity – the very

-49-

crime the officers expected to find in the area.  See id. at 122
(noting that officer conducted a protective weapons search "because
in his experience it was common for there to be weapons in the near
vicinity of narcotics transactions").

In rejecting the high-crime area characterization for the
area of Blue Hill Avenue where Wright was stopped, the district
court necessarily concluded that the requisite links between the
area's criminal history and Wright's observed conduct were missing.
I discern no clear error in that conclusion.  Unlike in Wardlow,
the officers here were not responding to specific reports of recent
crimes.  Officer Bordley testified that they were not heading
toward a specific location, but "just happened to be in the
Mattapan area [of Dorchester] at the time."  Officer Celester said
he and his colleagues had no special instructions that evening and
were in the area to do "proactive policing" and to "aggressively
patrol areas, targeting gangs and things like that."[14]

As noted, the officers did testify to their recurring
experiences with crime in the area.  Bordley stated that he went to
the vicinity of the 1200 block of Blue Hill Avenue at least once
during each shift he worked and that he had made fifty or sixty
arrests in that area for various crimes, including drug offenses

---

[14]    Bordley testified that there was a high volume of drug
trafficking in that area at the time, but he had no memory of
whether he or other officers had made any arrests for such crimes
during October and early November 2004.

and assault and batteries.  He also had encountered "a couple of shootings" there.  He did not say when those arrests and shootings occurred, however, and he had no specific recollection of the type of arrests he or any members of his task force had made in October and early November 2004.[15]

The empirical evidence in the record also fails to connect the officers' general perceptions about high levels of crime in the area to the specific time and location of Wright's arrest, or show that firearms crimes were of particular concern during that period.  Defense counsel requested incident reports from the Boston Police Department for all violent crimes involving a firearm that occurred in October and early November 2004 within 1,000 feet of the location of Wright's arrest.  Thirteen incidents were listed, but the ten available reports showed only two episodes (on October 12 and October 19) in which armed individuals had threatened random individuals on the street.[16]  In addition,

---

[15]  The prosecutor asked Bordley if he had made arrests in that area "before" – presumably meaning "before" Wright's arrest.  Bordley replied that he had made fifty or sixty arrests in the area for a variety of crimes and had "[b]een in that area where there were a couple of shootings."  Bordley had been with the Boston Police Department for eleven years by the time of the suppression hearing, and he had been assigned to the Youth Violence Task Force for approximately five years.  It is a fair inference that he was summarizing events that occurred throughout his time on the force.

[16]  Of the ten listed incidents for which reports were available, the only additional incident clearly involving a firearm stemmed from a personal dispute among co-workers at a Home Depot store.  Two other reports described firearms incidents outside the 1,000-foot range, and the remaining reports described incidents in which

although the Department typically prepared biweekly reports and maps showing "hot spots" throughout the city,[17] no statistics and maps were generated between August 31 and November 8 – the date of Wright's arrest – because the format of the Department's data collection was being revamped during that period. Defense counsel reported in an affidavit that the two most recent such reports, from August 2004, showed that the nearest hot spots were 1.5 and more than 2 miles from the Blue Hill Avenue location of Wright's arrest.

In its post-remand memorandum to the district court, the government asserted that the reasonableness of the officers' perception of the location as a high crime area was "not significantly undercut" by the crime reports offered by the defendant as evidence that "the actual incidence of crime in this area was not particularly high." The government noted that the officers "relied on their extensive experience and a longer history of information collected from the area in drawing the conclusion that the neighborhood had experienced a high incidence of crime."

A generalized notion of the area's criminal history does

the original firearm information was not confirmed when the officers went to the scene. One of the incidents for which a report was unavailable was described as an assault with a dangerous weapon.

[17] Bordley explained that "by the map you could tell what crimes occurred in what area, and you could tell which area had the more crimes . . . by the number of hits that were happening . . . in that place."

not, however, establish any of the factors that we cited as pertinent in considering whether a neighborhood is a "high crime area" such that it should be given weight in the reasonable suspicion calculus. When recent crimes of a particular type have occurred in a reasonably circumscribed area in proximity to where an individual is seen exhibiting conduct suggestive of that type of crime, the location is relevant in interpreting that individual's conduct. The individual's conduct is reasonably viewed more suspiciously because it mirrors particular criminal conduct that the observing police officers have reason to expect will recur in that specific location.

By contrast, the catalog of crimes reported by the officers in this case, drawn from their experiences over the years patrolling in Dorchester, provides no link between any particular crime the officers had reason to anticipate and Wright's observable conduct. Many innocent acts can be construed as suggestive of some kind of crime. If it were enough for purposes of the Fourth Amendment reasonable suspicion analysis that crimes of various types had regularly occurred along that stretch of Blue Hill Avenue, virtually every act by every individual in the neighborhood would be subject to heightened scrutiny and suspicion – a state of affairs inconsistent with the principle of <u>particularized</u> suspicion. <u>See</u> <u>generally</u> <u>The "High-Crime Area" Question</u>, 57 Am. U. L. Rev. at 1628-31 (observing that, "[t]o alter fundamental Fourth

Amendment protections, it would seem necessary that the area really be qualitatively different," and proposing "an objective, quantifiable approach" that would include "a geographic and temporal limitation"). On this record, therefore, the district court supportably concluded that the government's evidence fell short of showing the links necessary to characterize the location of Wright's arrest as a high crime area under Wardlow.

If, as the government urges, we were to consider the general character of an area in the reasonable suspicion inquiry notwithstanding a failure of proof on the high crime area designation, we would be allowing anecdotal characterizations of an area's criminal history to overwhelm the particularized analysis that provides protection against arbitrary police conduct. If the government is unable to persuade the district court that a location warrants the high crime area designation in the relevant sense, the officers' generalized perceptions of "high crime" cannot supplant the deficiencies in evidence underlying the rejection of the high crime area designation – here, the absence of a proven nexus, at the relevant time, "between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case," Wright I, 485 F.3d at 53-54.

I realize that it is tempting, in evaluating the reasonableness of police officers' actions, to acknowledge and give weight to their general knowledge that an area is dangerous, even

-54-

without the more formal high crime area finding. Certainly, it is unrealistic to think that police officers, or any reasonable person, would be unaffected by the fact that crimes of various types have regularly occurred in an area where they are walking or driving. Nonetheless, if "a generic fear of what might happen in a high-crime area" were enough to trigger the high crime area factor in a reasonable suspicion inquiry, United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005), without any specific expectation of criminal activity to focus law enforcement attention, the protections afforded by the Constitution would too often be compromised for the poor and minorities, who historically have comprised "'almost all of the population in most of the neighborhoods the police regard as high crime areas.'" Montero-Camargo, 208 F.3d at 1138 n.31 (quoting David A. Harris, Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked, 69 Ind. L.J. 659, 677 (1994)); see also United States v. Caruthers, 458 F.3d 459, 467 (6th Cir. 2006) ("[L]abeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling.").

The Fourth Amendment thus requires law enforcement officers to resist the stereotypes associated with bad neighborhoods and to ground their suspicion in "'specific and articulable facts.'" Espinoza, 490 F.3d at 47. Indeed, the danger in giving weight to police officers' general perceptions of an

area, in the absence of a high crime area finding, is starkly illustrated by the court's conclusion that the officers here inferred that Wright might be carrying a gun. The district court invoked the officers' experience and knowledge "in that area of Boston" to draw an inference on behalf of the officers that is otherwise without any factual foundation. But the general awareness that crimes of various types regularly occur in Dorchester cannot transform an ordinary movement – securing an item in one's pocket while running – into a suspicious act. See United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood."). In this case, therefore, the officers' general knowledge of crime in Dorchester is not an appropriate element of the reasonable suspicion inquiry.

### c. Conclusion on the Belief that Wright was Armed

Excluding the court's improper consideration of the location, and absent testimony indicating that Wright's conduct or appearance would suggest to a reasonable officer that he had a gun in his pocket, the court's finding that the officers inferred that Wright might be armed is unsupportable. The record tells us only that the officers saw Wright clutching at his sweatshirt, near his waist, as he ran. The district court thus lacked a sufficient

evidentiary basis to infer that a reasonable officer would believe that Wright might be carrying a weapon.[18]

**B.  Summary of Unsupported Facts and Inferences**

My examination of the historical facts and inferences underlying the district court's analysis has thus revealed multiple flaws:  (1) the impermissible reliance on the court's own professed knowledge that the police drive Crown Victorias to infer that Officer Bordley thought Wright, upon leaning forward, had identified the unmarked cruiser as a police car, (2) the lack of testimonial support for the court's pivotal inference that the officers believed Wright might be carrying a weapon, (3) reliance on the officers' general perceptions of "that area of Boston," and (4) factoring the officers' response to Wright's conduct into the calculus.  These problems do not, however, necessarily prevent a reviewing court from reaching the same conclusion as the district court about reasonable suspicion based on an independent review of the supportable historical facts and inferences.  Hence, I now turn

---

[18]  The majority agrees that the district court improperly drew the inference that the officers would have believed that Wright was carrying a gun.  In yet another revision of the district court's opinion, the majority nonetheless holds that the court could have reasonably concluded that a reasonable officer would have believed that Wright was carrying contraband based on the same innocent motion of clutching at his pocket while running.  It relies solely on its own finding of flight to reach that conclusion.  The record, however, can no more be read to support an inference that Wright was carrying contraband than that he was carrying a gun, rather than, in the majority's words, "something else that is frequently kept in pockets, such as keys."

to that inquiry.[19]

## II.

This case is so difficult because it is hard to resist looking at the events through the lens of their eventual outcome, despite the principle that a seizure cannot be justified by its results. From our present vantage point, it appears that Wright almost certainly was fleeing from the police to avoid being found with a gun that he possessed unlawfully. See McKoy, 402 F. Supp.

---

[19] As I describe, the majority has bolstered its reasonable suspicion analysis by taking a number of liberties with the record and the district court's explanation of its decision:

(1) where the district court improperly framed its inferences in subjective terms, the majority recasts them as imperfectly expressed objective findings, see supra § 1.A.2;
(2) in addressing the court's finding that Wright recognized the car in front of him as a police vehicle, the majority ignores the district judge's reliance on his own background knowledge of Crown Victorias and instead supplies multiple other rationales not argued by the government and not supported by the record, see supra n.2;
(3) where the district court specifically said that Wright was not fleeing when he first exited the vehicle in which he was riding, the majority concludes that the court either did not mean what it said or committed clear error, see infra n.14;
(4) the majority entirely ignores the district court's unmistakable reliance on the nature of the area as support for its conclusion of reasonable suspicion, see supra n.4;
(5) the majority concludes that the presence of Omar Edwards in the vehicle with Wright was both irrelevant and relevant, see infra n.12; and
(6) the majority concludes that the district court clearly erred in finding that the officers reasonably could have believed Wright was carrying a gun, but goes on – without any support – to find a basis for believing that Wright had contraband in his pocket, see supra n.10.

Given its unusual approach to the record and the district court's decision, the majority's different outcome is unsurprising.

-58-

2d at 316 ("[I]t is difficult [for courts] to conclude it was objectively unreasonable for the officers to believe a suspect was armed when in fact he was.).""  That reality expressly crept into the district court's original ruling on the suppression motion, causing the court to reason backwards from the discovery of the gun in assessing the officers' conduct.  Indeed, remnants of that improper reasoning contributed to the court's willingness on remand to infer that the officers believed Wright had a weapon, even without testimony from the officers that they possessed such a belief or any evidence that the item in Wright's pocket was a gun rather than something else.

In the Fourth Amendment context, however, it is critically important that we not allow the ends to justify the means.  I have therefore been exacting in my review of the evidence underlying the district court's ruling to prevent the knowledge of the weapon he was carrying from influencing my view of the behavior that preceded its discovery.

I thus turn to the totality of the circumstances supported by the record to consider de novo whether the officers had a reasonable suspicion justifying their decision to detain Wright.  Given the gaps in the record and the resulting defects in the district court's findings, the facts that are properly considered are limited.  Like the majority, I do not treat the location of the stop as a high crime area for purposes of my

inquiry.   Unlike the majority, I cannot rely on a reasonable officer's having inferred, at the time Wright exited his vehicle, that he recognized the police cruiser as such.   Nor may I infer that a reasonable police officer would have suspected, based on Wright's clutching motion, that he was carrying a gun.   The circumstances that may be considered thus consist of four historical facts: (1) Wright leaned forward from the backseat of the car in which he was a passenger to try to identify the occupants of the vehicle parked in front of him; (2) he then quickly exited his car and ran down the street; (3) he clutched at the pocket of his sweatshirt as he ran, and (4) when the officers shouted at him to stop, identifying themselves as police officers, he continued on his way up Blue Hill Avenue.[20]

I therefore proceed to look at each of these acts chronologically, reviewing Wright's actions in sequence as the police officers would have encountered them, before considering their significance in combination.

---

[20]   As the majority points out, the government also cites as a relevant fact Officer Brown's recognition of Omar Edwards, a recent shooting victim, as the front-seat passenger in the car in which Wright had been sitting.   Like the majority, I fail to see how Edwards' injury at some unspecified time in the past, with no connection to Wright, could contribute to a finding of reasonable suspicion that Wright was involved in unlawful activity on the night he was seized.   The majority goes on to make the cryptic statement that, despite this irrelevance, Edwards' presence was not entirely irrelevant.   I have no idea what that means, and I see no way in which the officers' focus on Brown or the vehicle plays a part in the reasonable suspicion inquiry.

## A. Leaning Forward from the Back Seat

Wright's leaning forward in the car is not suspicious conduct. Checking out the occupants of a car that has stopped near one's own is an everyday act that by itself is not suggestive of criminal conduct.

## B. Running Down the Street

The district court explicitly resisted using the word "flee" to describe Wright's initial running from the car, accentuating that when Wright started to run, the running was not yet flight.[21] The court thus implicitly found that Wright's departure lacked any characteristic that would permit a reasonable officer to conclude that he was running from the officers rather than to a pre-planned destination. The government has not challenged this "no flight" finding, and it is a supportable view of the ambiguous circumstances described by the officers.[22]

---

[21] The court stated:

> I infer from the testimony that, though things happened in split second intervals, Mr. Wright had started to run, I do not at this point say flee, he had started to run before the officers had started to run after him.

[22] Despite the government's failure to challenge the finding, the majority concludes that the district court either did not find "no flight" or that any such finding was clearly erroneous. The majority relies, in part, on the unsupported inference that Wright "made" the lead car in the caravan. The district court, however, rejected characterizing Wright's running as flight despite its finding that Wright would have identified the Crown Victoria as a police vehicle. As I explain, the court reasonably found that the officers could not at this juncture infer that Wright was fleeing, and the majority may not reject that finding simply because it

-61-

Wright's car had come to a stop in front of the mini-mart before the police car pulled over, and Wright emerged from his vehicle and started to run before the officers made any attempt to approach him. I have already shown that the record lacks support for a finding that Wright knew that Boston police officers use Crown Victorias as unmarked cruisers, and none of the officers testified to conduct by Wright suggesting that he ran from the car because he recognized them as police officers. They did not describe his exit from the vehicle as unusual, unexpected, or otherwise seemingly designed to elude them.[23] Wright then proceeded straight up the street, and the officers were able to catch up to him within seconds.

Running away, rather than walking, makes Wright's departure potentially more suspicious. See Caruthers, 458 F.3d at 466 ("'[T]he speed of the suspect's movements may be relevant in the totality of the circumstances'" (quoting United States v.

---

disagrees with it.

[23] Officer Brown testified that as soon as Wright exited the vehicle, he "turned to his right, grabbed onto his hooded sweatshirt pocket right about here and began to run up Blue Hill Avenue." He later elaborated: "It was real quick. It was just he gets out, he looks to his left, grabbed his jacket pocket and he proceeds to run up Blue Hill Avenue." Officer Celester testified that, as the first car in the four-car caravan either "stopped or drove by" Wright's vehicle, "the rear passenger jumped out and ran." Officer Bordley's testimony was similar: "That occupant that was in the rear seat ended up getting out of the rear seat, stepped out of the motor vehicle, grabbed the right side of his sweater and took off running up Blue Hill Avenue in the direction of Clarkwood Street."

-62-

<u>Gordon</u>, 231 F.3d 750, 757 (11th Cir. 2000)). Running is reasonably seen as "flight," however, only when other factors permit the conclusion that the runner is acting in an unexpected or unconventional way, or in response to police presence. <u>See</u> <u>Wardlow</u>, 528 U.S. at 125 ("Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite.").

Here, Wright's behavior – exiting a newly parked car and following a straight path up the main street – was fully consistent with "'going about [his] business.'" Indeed, Wright points out that he ran <u>toward</u> the three other unmarked cruisers in the caravan.[24] Moreover, his running was unaccompanied by other circumstances that have been associated with flight, such as an abrupt change in behavior, a suspicious utterance, or an odd or indirect path. <u>Cf.</u> <u>Wardlow</u>, 528 U.S. at 122 (describing defendant's path "through the gangway and an alley"); <u>United States</u> v. <u>Lawshea</u>, 461 F.3d 857, 859-60 (7th Cir. 2006) (stating that defendant "not only ran away from the officer, but he sprinted around the same building three times"); <u>Aitoro</u>, 446 F.3d at 249 (recounting that defendant or his companion exclaimed "'Oh shit'" after recognizing officers and then "'did an abrupt about-face and sprinted in the reverse direction'"); <u>United States</u> v. <u>Franklin</u>, 323 F.3d 1298, 1302 (11th Cir. 2003) (noting that defendant's

---

[24] I agree with the majority that Wright's running toward the other cars "does not defeat a finding of flight." It diminishes, however, the significance of his running away from the lead car.

flight was "particularly suspicious because of its nature and duration," where defendant "ran away at full speed as soon as he saw the officers" and "ran behind [a] building, climbed a fence, sprinted across a parking lot and began to scale a second fence"); United States v. Harris, 218 Fed. Appx. 525, 528 (7th Cir. 2007) (unpublished) (reporting that, when defendant spotted a marked police cruiser, he "did an immediate and abrupt about-face and walked across a muddy yard despite an available and cleaner alternative route").

I thus accept the district court's implicit finding that a reasonable officer would not have concluded that Wright was fleeing from the officers when they saw him run from the car.

## C. Clutching at the Sweatshirt

As I have recounted, there is no basis in the record for inferring that Wright's clutching at his sweatshirt was anything more than the natural motion of a runner seeking to protect an item in his pocket from slipping out.

## D. Refusing to Stop

Unquestionably, Wright's disregard of the officers' order to stop is suspicious. Although an individual approached by an officer who lacks reasonable suspicion of criminal activity may ignore the police and go about his business, Florida v. Royer, 460 U.S. 491, 498 (1983), we would ordinarily expect individuals with nothing to hide to comply with direct police requests to stop, if

for no other reason than to dispel suspicion. Wright's refusal to stop makes it virtually inevitable that the pursuing officers would believe - reasonably - that he had been deliberately running from them when he exited his car, and was not merely departing quickly for a previously scheduled rendezvous somewhere on Blue Hill Avenue.

Nonetheless, I am not prepared to conclude that reasonable suspicion is automatically established whenever an individual fails to heed a police officer's command to stop running. In this instance, only seconds had passed from the time Wright started running until he was caught.[25] If the order to stop was Wright's first notice that the officers were focused on him - and the record does not show otherwise - he had almost no time to process their demand and consider his response before the officers tackled him. In my view, reasonable suspicion does not arise from the mere fact that a young man running down the street fails to come to a sudden halt when police officers unexpectedly order him to do so.

However, neither Wright's refusal to stop nor his other behaviors may be considered in isolation. I therefore turn to an assessment of the circumstances as a whole. See United States Arvizu, 534 U.S. 266, 274 (2002) (noting that the factors must not

---

[25] Officer Bordley testified that Wright ran a total of about fifty or sixty feet from the car in which he had been riding to where he was stopped.

be considered "in isolation from each other"); <u>Ruidíaz</u>, 529 F.3d at 30 (noting that "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance").

E.    **Totality of the Circumstances**

My discussion makes it apparent that, up to the point the officers directly engaged Wright by ordering him to stop, a reasonable police officer would not have suspected that criminal activity was afoot. Although the government asserts that Wright's running and clutching – after he had leaned forward to look at the Crown Victoria – was enough to justify the stop, those two actions, on this record, were ordinary for the circumstances. Wright exited a parked car immediately after looking at the vehicle that pulled over in front of him and ran up the street, grabbing at his pocket as would any runner seeking to secure an item as he ran. Even in combination, these behaviors do not provide a "particularized" basis for suspecting Wright of criminal activity.

I thus must consider whether Wright's failure to stop in response to the police order, considered together with his earlier actions, gave rise to reasonable suspicion. The question is close. Certainly, the refusal to stop cast Wright's earlier running in a new light, permitting a reasonable police officer to infer at that point that Wright had run off initially because he realized the occupants of the Crown Victoria were law enforcement officers.

Critically, however, nothing in the record would permit a reasonable officer, even in retrospect, to conclude that Wright's otherwise innocent motion in clutching his sweatshirt suggested he might have a gun or other contraband in his pocket. One can accept such a conclusion only by giving in to stereotypes and adopting a sinister explanation for Wright's behavior – i.e., that a twenty-five-year-old man refusing to stop for the police in "that area" is likely to be involved in violent conduct or drug activity, leading to the inference that he might have a gun or narcotics in his pocket. That logic, for reasons I have explored at length, is impermissible. The only suggestive behaviors remaining, therefore, are Wright's initial running and his later refusal to stop.

In these particular circumstances, that is simply not enough. Wright was in an area where "aggressive patrolling" by the police was routine; indeed, in its original ruling, the district court found that the officers intended "to get out of their cruiser, make inquiry of the Wright vehicle, if not of other people, lawfully but aggressively to find out where they were going and what they were doing." In that context, Wright's possible decision to run off to avoid an encounter with the police tells us little; innocent individuals would also be highly motivated to avoid such an intrusion. See generally Wardlow, 528 U.S. at 132 (Stevens, J., concurring in part and dissenting in part) ("Among some citizens, particularly minorities and those residing in high

crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence."); id. at 133 (noting that "these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices"); Amy D. Ronner, Fleeing While Black: The Fourth Amendment Apartheid, 32 Colum. Hum. Rts. L. Rev. 383, 396 (2001) ("Because minorities and residents of high crime areas are popular targets of police abuse, they are also the ones most prone to run at the mere sight of the police.").

As I have described, Wright's running throughout the incident lacked suspicious characteristics – it began at a natural point for departure, when he exited a vehicle; he ran directly down a main street, and the officers reported no furtive gestures or exclamations when he began to run; his continued running in the face of an order to stop lasted for only moments before he was apprehended. It is possible, of course, that Wright's behavior would have become more suspicious if the pursuit had continued,[26]

---

[26] Although not part of the district court's findings of fact, Bordley testified that one officer (he thought it was Officer Foley) had exited his car and "tried to grab" Wright as he passed, and that "it slowed [Wright] up just enough so I was able to catch up to him and grab him." This testimony does not tell us whether Foley's action caused Wright to alter his course or how it "slowed him up." Given the short span of the entire episode, it appears

and he had used more evasive tactics to get away from the officers. But those are not the facts we have here.

I recognize that reasonable suspicion is not defeated by the possibility that the conduct observed was innocent. See Wardlow, 528 U.S. at 125-26. Mere possibility, however, is also not enough to establish reasonable suspicion. See United States v. Urrieta, 520 F.3d 569, 578 (6th Cir. 2008) ("The Fourth Amendment simply does not allow a detention based on an officer's 'gut feeling' that a suspect is up to no good."). The facts before us do not depict accumulating circumstances that, in totality, support a reasonable suspicion that Wright possessed a gun or other contraband, but show instead a consistent course of conduct that, even taken as a whole, strengthens only the inference that Wright did not want to interact with the police. See United States v. Cortez, 449 U.S. 411, 418 (1981) ("[A]n assessment of the whole picture must yield a particularized suspicion . . . ."); cf. Wardlow, 528 U.S. at 130 n.4 (noting that, in Terry, "reasonable suspicion was supported by a concatenation of acts, each innocent when viewed in isolation, that when considered collectively amounted to extremely suspicious behavior") (Stevens, J., concurring in part and dissenting in part).

Our reasonable suspicion analysis in Aitoro provides a

---

that Foley's action may have occurred almost simultaneously with the stop.

helpful contrast, showing the deficiencies in the evidence here. In that case, a number of officers – more than five – had positioned themselves in an area "'with frequent street-level drug selling activity.'" 446 F.3d at 249. Defendant Aitoro was arrested after he and another man abruptly reversed direction and sprinted off when they saw three police officers get out of their car. Aitoro sought to distinguish his case from Wardlow by pointing out that the police in Wardlow "were specifically on the lookout for drug-purchasing customers and scouts for drug traffickers looking for approaching police," and that Wardlow was seen carrying a bag that made him "a particular target for suspicion. Id. at 253. We concluded, however, that two significant facts "gave the police at least as much additional basis for suspicion" that Aitoro was involved in drug trafficking as the defendant's bag gave to the police in Wardlow: the exclamation of "Oh shit" by Aitoro and an officer's sighting of a bulge at Aitoro's waist that he thought was a gun. Id.

Here, we have no facts that are inferentially revealing of criminal activity – such as the exclamation or the bulge – and Wright's running is ambiguous in context. The gap between Wright's refusal to obey the police order to stop and a supportable finding of reasonable suspicion would perhaps be bridged if the officers had testified to their rationale, arising from their expertise, for responding as they did to the behaviors they saw. Little more is

necessary in this case to cross the threshold from hunch to reasonable suspicion. As I have noted, the analysis would be different if the officers had described some characteristic of Wright's pocket or other evidence that would support the belief of a reasonable officer that he was carrying a gun or other contraband. Without such evidence, however, Wright's running failed to blossom into anything more sinister than an attempt to avoid the officers – a perfectly lawful and, in context, predictable course of action.

That so little substantiation might redeem the government's case does not render the redemption unnecessary or pointless. If the government is forced to make explicit the basis for the officers' reactions, including why they might be suspicious of conduct that otherwise appears innocent, the defense can challenge that testimony and the truth-seeking purpose of the adversary process can work. But if the constitutional determination of reasonable suspicion rests on unsupported inferences, judicially noticed facts, vague references to experience or a general pattern of crime in the area, the constitutional analysis becomes little more than a means of justifying a search or seizure on the basis of its result.

"[W]e are cognizant of the important role that the police play in keeping our citizens safe, and we do not lightly second guess the decisions made by police officers in the field . . . ."

-71-

Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003). At the same time, however, we have an obligation to take seriously the constitutional principles that protect individuals from unwarranted law enforcement intervention. The real test of our commitment to those fundamental principles occurs when we are asked to apply them in close cases. Here, I are compelled to conclude that the deficiencies in the district court's finding of reasonable suspicion are not offset by the totality of the remaining circumstances. In sum, I cannot identify "'specific and articulable'" facts and inferences that are sufficiently grounded in Wright's conduct to anchor a finding of reasonable suspicion. Accordingly, unlike the majority, I would reverse the district court's denial of Wright's motion to suppress and remand for entry of an order granting the motion.